**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| CITY OF CHARLESTON,<br><br>    Plaintiff,<br><br>    v.<br><br>BRABHAM OIL COMPANY, INC.;<br>COLONIAL GROUP, INC.; ENMARK<br>STATIONS, INC.; COLONIAL PIPELINE<br>COMPANY; PIEDMONT PETROLEUM<br>CORP.; EXXON MOBIL CORPORATION;<br>EXXONMOBIL OIL CORPORATION;<br>ROYAL DUTCH SHELL PLC; SHELL OIL<br>COMPANY; SHELL OIL PRODUCTS<br>COMPANY LLC; CHEVRON<br>CORPORATION; CHEVRON U.S.A. INC.;<br>BP P.L.C.; BP AMERICA INC.; MARATHON<br>PETROLEUM CORPORATION;<br>MARATHON PETROLEUM COMPANY LP;<br>SPEEDWAY LLC; MURPHY OIL<br>CORPORATION; MURPHY OIL USA, INC.;<br>HESS CORPORATION; CONOCOPHILLIPS;<br>CONOCOPHILLIPS COMPANY; PHILLIPS<br>66; AND PHILLIPS 66 COMPANY,<br><br>    Defendants. | **C/A No. <u>2:20-cv-03579-RMG</u>** |

<u>**PLAINTIFF'S SUPPLEMENTAL OPENING BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION TO REMAND TO STATE COURT**</u>

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................1

II.    STATEMENT OF FACTS .....................................................................................2

III.   ARGUMENT ..........................................................................................................5

       A.   General Legal Standards ............................................................................. 7

       B.   The Fourth Circuit in *Baltimore* "Resoundingly" Rejected Defendants'
            Position That Claims Like the City's Arise Under Federal Common Law. ............ 8

       C.   *Baltimore* Forecloses Removal Under the Outer Continental Shelf Lands Act. ... 14

       D.   Defendants' Federal Officer Removal Arguments Are Foreclosed by
            *Baltimore*, and the "New" Factual Details in Their Removal Notice Do Not
            Confer Jurisdiction. .................................................................................... 16

            1.   Charleston Has Not Brought Suit Against Defendants "For or Relating
                 To" Any Act Defendants Committed Under Federal Direction. ................ 17

            2.   Defendants Have Not "Acted Under" Federal Officers in Any
                 Relevant Way. ................................................................................... 19

       E.   The Clean Air Act Does Not Completely Preempt State Law, and Defendants
            Have Abandoned Complete Preemption as a Basis of Removal. .......................... 28

       F.   *Baltimore* Forecloses Defendants' Federal Enclave Jurisdiction Argument. ........ 30

       G.   The Class Action Fairness Act Cannot Provide Jurisdiction Because This Is
            Not a Class Action, and Defendants Have Abandoned the Argument. ................. 31

       H.   The South Carolina Resident Defendants Were Not Fraudulently Joined. ........... 32

       I.   The Court Should Award the City Just Costs and Fees Because Defendants
            Had No Objectively Reasonable Basis to Remove This Case. ............................ 33

IV.    CONCLUSION ....................................................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Am. Elec. Power Co. v. Connecticut,*
    564 U.S. 410 (2011) ..................................................................................................... 8, 9

*Baker v. Atlantic Richfield Co.,*
    962 F.3d 937 (7th Cir. 2020) ......................................................................................... 19

*Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.,*
    25 F.4th 1238 (10th Cir. 2022) ................................................................................ *passim*

*Caterpillar Inc. v. Williams,*
    482 U.S. 386 (1987) ........................................................................................................ 7

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
    511 U.S. 164 (1994) ...................................................................................................... 21

*City & Cnty. of Honolulu v. Sunoco LP,*
    39 F.4th 1101 (9th Cir. 2022) ....................................................................... 1, 20, 25, 26

*City & Cnty. of Honolulu v. Sunoco LP,*
    No. 20-CV-00163-DKW-RT, 2021 WL 531237 (D. Haw. Feb. 12, 2021) ................. 5, 18

*City of Hoboken v. Chevron Corp.,*
    45 F.4th 699 (3d Cir. 2022) .................................................................................... *passim*

*City of Milwaukee v. Illinois,*
    451 U.S. 304 (1981) ........................................................................................................ 9

*City of Oakland v. BP PLC,*
    969 F.3d 895 (9th Cir. 2020) .......................................................................... 1, 9, 29, 30

*Cnty. of San Mateo v. Chevron Corp.,*
    32 F.4th 733 (9th Cir. 2022) ................................................................................... *passim*

*Connecticut v. Exxon Mobil Corp.,*
    No. 3:20-CV-1555 (JCH), 2021 WL 2389739 (D. Conn. June 2, 2021) ................... 2, 18

*Delaware v. BP Am. Inc.,*
    578 F. Supp. 3d 618 (D. Del.) ......................................................................... 18, 22, 25

*Dixon v. Coburg Dairy, Inc.,*
    369 F.3d 811 (4th Cir. 2004) .......................................................................................... 7

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.,*
    463 U.S. 1 (1983) ........................................................................................................... 7

*Gause v. Smithers,*
    403 S.C. 140 (S.C. 2013) .............................................................................................. 33

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.,*
    545 U.S. 308 (2005) ....................................................................................................... 5

*Hartley v. CSX Transp., Inc.,*
    187 F.3d 422 (4th Cir. 1999) ............................................................................. 7, 32, 33

*Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*,
   535 U.S. 826 (2002) .................................................................................................. 7

*Illinois v. City of Milwaukee*,
   406 U.S. 91 (1972) .................................................................................................... 9

*In re Commonwealth's Motion to Appoint Counsel Against or Directed to*
   *Defender Ass'n of Philadelphia*,
   790 F.3d 457 (3d Cir. 2015) .................................................................................. 19

*In re Deepwater Horizon*,
   745 F.3d 157 (5th Cir. 2014) .......................................................................... 14, 15

*Johnson v. Am. Towers, LLC*,
   781 F.3d 693 (4th Cir. 2015) ................................................................................ 32

*Lontz v. Tharp*,
   413 F.3d 435 (4th Cir. 2005) .................................................................................. 7

*Martin v. Franklin Capital Corp.*,
   546 U.S. 132 (2005) ............................................................................................... 34

*Massachusetts v. Exxon Mobil Corp.*,
   462 F. Supp. 3d 31 (D. Mass. 2020) ................................................................ 2, 32

*Mayor & City Council of Baltimore v. BP P.L.C.*,
   31 F.4th 178 (4th Cir. 2022) ......................................................................... *passim*

*Merrell Dow Pharms. Inc. v. Thompson*,
   478 U.S. 804 (1986) ........................................................................................... 7, 10

*Metro. Life Ins. Co. v. Taylor*,
   481 U.S. 58 (1987) ................................................................................................... 7

*Minnesota v. Am. Petroleum Inst.*,
   No. CV 20-1636 (JRT/HB), 2021 WL 1215656 (D. Minn. Mar. 31, 2021) ...... *passim*

*Purdue Pharma L.P. v. Kentucky*,
   704 F.3d 208 (2d Cir. 2013) ................................................................................. 31

*Rhode Island v. Shell Oil Prods. Co.*,
   35 F.4th 44 (1st Cir. 2022) ................................................................ 1, 10, 14, 16

*Robinson v. Pfizer Inc.*,
   No. 4:16-CV-439 (CEJ), 2016 WL 1721143 (E.D. Mo. Apr. 29, 2016) ................... 34

*Rodriguez v. Fed. Deposit Ins. Corp.*,
   140 S. Ct. 713 (2020) ...................................................................................... 10, 11

*Sawyer v. Foster Wheeler LLC*,
   860 F.3d 249 (4th Cir. 2017) .......................................................................... 17, 27

*Skidmore v. Norfolk S. Ry. Co.*,
   1 F.4th 206 (4th Cir. 2021) .................................................................................. 28

*Stoney Marine Int'l Ltd. v. Arthur J. Gallagher & Co.*,
   2016 WL 7334862 (D.S.C. Dec. 19, 2016) ............................................................ 33

*United States v. Moffitt, Zwerling & Kemler, P.C.*,
    83 F.3d 660 (4th Cir. 1996) ................................................................... 12

*United States v. Standard Oil*,
    332 U.S. 301 (1947) ............................................................................ 12

*United States v. Swiss American Bank, Ltd.*,
    191 F.3d 30 (1st Cir. 1999) ................................................................... 12

*Vaden v. Discover Bank*,
    556 U.S. 49 (2009) ................................................................................ 7

*W. Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*,
    646 F.3d 169 (4th Cir. 2011) ........................................................... 31, 32

*Watson v. Philip Morris Co.*,
    551 U.S. 142 (2007) ........................................................................ 19, 20

*Winters v. Diamond Shamrock Chem. Co.*,
    149 F.3d 387 (5th Cir. 1998) ................................................................. 27

## Statutes & Constitutions

28 U.S.C. § 1331 ...................................................................................... 7, 13

28 U.S.C. § 1332(d) ..................................................................................... 31

28 U.S.C. § 1345 .......................................................................................... 12

28 U.S.C. § 1441 ............................................................................................ 7

28 U.S.C. § 1442 ..................................................................................... *passim*

28 U.S.C. § 1447(c) ................................................................................. 2, 34

28 U.S.C. § 1453 ..................................................................................... 1, 31

30 U.S.C. § 266(i) ....................................................................................... 22

42 U.S.C. § 6241(a) ..................................................................................... 25

42 U.S.C. § 7401 ........................................................................................... 5

43 U.S.C. § 1331 ........................................................................................... 5

43 U.S.C. § 1349(b) ................................................................................. 6, 14

S.C. Code § 39-5-140(a) .............................................................................. 32

U.S. Const. art. I, § 8, cl. 17 ....................................................................... 30

## Rules

Fed. R. Civ. P. 4(k)(2) ................................................................................. 13

Fed. R. Civ. P. 23 .................................................................................... 6, 31

## Regulations

43 C.F.R. § 3103.4-4 ................................................................................... 22

## I.    INTRODUCTION

The City of Charleston ("City" or "Charleston") brought this action in South Carolina state court in September 2020, asserting South Carolina common law and statutory claims for public and private nuisance, negligent and strict liability failure to warn, trespass, and violations of the South Carolina Unfair Trade Practices Act. *See generally* Complaint, Doc. 1-2 ("Compl."). The City seeks to rectify its local injuries caused by Defendants' decades-long campaign to discredit the science of global warming, conceal the dangers posed by their fossil fuel products, and misrepresent their role in responding to the climate crisis. Defendants removed on October 9, 2020, asserting eight different jurisdictional theories that all misrepresent the City's Complaint and controlling law. Since then, the Fourth Circuit has squarely rejected six of those theories and affirmed remand to state court in *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022). That decision is directly on point and controls. None of Defendants' removal theories hold water.

The *Baltimore* decision is not only binding, it is also correct. The Fourth Circuit's ruling is in concert with a unanimous chorus of decisions from its sister circuits. In 2022 the First, Third, Ninth, and Tenth Circuits all also affirmed orders granting remand in materially indistinguishable cases, involving many of the same defendants here, removed on identical jurisdictional theories, including as recently as August 17, 2022.[1] Three other district courts have granted motions to remand in closely analogous postures, rejecting all the same theories the Fourth Circuit addressed in *Baltimore*, plus the argument under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1453,

---

[1] *City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022) (*"Hoboken"*); *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1106 (9th Cir. 2022) ("*Honolulu*"); *Rhode Island v. Shell Oil Prods. Co.*, 35 F.4th 44, 50 (1st Cir. 2022) ("*Rhode Island*"); *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733 (9th Cir. 2022) ("*San Mateo*"); *Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1249 (10th Cir. 2022), *cert. petition filed* (June 8, 2022) ("*Boulder*"); *see also City of Oakland v. BP PLC*, 969 F.3d 895 (9th Cir. 2020) (reversing order denying remand), *cert. denied*, 141 S. Ct. 2776 (U.S. June 14, 2021).

that Defendants raise in this case.[2] The only jurisdictional argument here that has not been rejected in the decisions cited above is Defendants Piedmont Petroleum Corp.'s and Brabham Oil Company, Inc.'s fraudulent joinder assertion, which is baseless for reasons the City has already explained. *See* Plaintiff's Motion to Remand to State Court at 58–63, Doc. 103 (Feb. 26, 2021) ("Mot.").

This case was filed more than two years ago and has yet to find a courtroom. No Defendant has answered the Complaint or filed a dispositive motion, and no discovery has been propounded or responded to; there has been no forward progress at all through Defendants' fog of meritless jurisdictional arguments. Defendants had no objectively reasonable basis to remove this case, and the Court should at last remand it to state court and award the City attorneys' fees and costs, as it requested in its original moving papers. *See* Mot. at 63–65; 28 U.S.C. § 1447(c).

## II.    STATEMENT OF FACTS

The City sued Defendants in South Carolina state court, asserting state-law tort and statutory claims. *See* Compl. ¶¶ 13, 153–218. The City's claims rest on Defendants' decades-long campaign to deceive and mislead consumers and the public about the impacts of climate change and its link to fossil fuels, which have led to disastrous impacts in Charleston. *See, e.g., id.* ¶¶ 1–12.

For more than half a century, Defendants have known that their fossil fuel products create greenhouse gases that change the climate and cause sea levels to rise. *Id.* ¶¶ 1, 7, 54–94. Starting as early as the 1950s, Defendants researched the link between fossil fuels and global warming, amassing a comprehensive understanding of the adverse climate impacts caused by their products. *Id.* ¶¶ 54–57. In internal reports and communications, their own scientists predicted that the

---

[2] *Connecticut v. Exxon Mobil Corp.*, No. 3:20-CV-1555 (JCH), 2021 WL 2389739 (D. Conn. June 2, 2021), *appeal pending*, No. 21-1446 (2d Cir.); *Minnesota v. Am. Petroleum Inst.*, No. CV 20-1636 (JRT/HB), 2021 WL 1215656 (D. Minn. Mar. 31, 2021), *appeal pending*, No. 21-1752 (8th Cir.); *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31 (D. Mass. 2020).

unabated consumption of fossil fuels would cause "dramatic environmental effects," warning that the world had only a narrow window of time to curb emissions and stave off "catastrophic" climate change. *Id.* ¶¶ 67, 71, 76, 79. Defendants took these warnings seriously: they evaluated impacts of climate change on their infrastructure, invested to protect assets from rising seas and more extreme storms, and developed technologies to profit off of a warmer world. *See id.* ¶¶ 127–32.

Defendants did not share their knowledge with the public, however, and instead embarked on a campaign of denial and disinformation about the existence, causes, and adverse effects of global warming. *See id.* ¶¶ 95–126. Among other tactics, Defendants (1) bankrolled scientists whose views conflicted not only with the overwhelming scientific consensus, but also with Defendants' internal understanding of global warming; (2) funded think tanks and foundations that disseminated positions Defendants knew to be inaccurate; and (3) spent millions of dollars on newspaper ads, radio commercials, and direct mail that cast doubt on the science of climate change. *See id.* When public awareness finally started catching up to Defendants' own knowledge of the dangers posed by their fossil fuel products, Defendants pivoted to a new deceptive strategy: so-called "greenwashing." *Id.* ¶¶ 141–51 (pp. 111–13).[3] They advertise that certain fossil fuel products are "green" or "clean," intending that the public believe those products to be more environmentally friendly, while failing to warn that those products remain the leading cause of climate change, which Defendants have known for decades. *Id.* ¶¶ 141, 143 (p. 111). And they misleadingly portray themselves as environmentally conscious companies that invest heavily in renewable energy sources, even though they devote negligible investments to low-carbon energy development and continue to develop new fossil fuel resources and production. *Id.* ¶¶ 144, 146 (pp. 111–12).

---

[3] Paragraph numbers 141–151 are inadvertently repeated in the Complaint. For clarity, citations to those paragraphs include the page numbers on which the relevant paragraphs appear.

Today the City bears the costs of Defendants' deception and disinformation, and will continue to do so in the years to come. *See id.* ¶¶ 146–52 (pp. 113–19). The City has already experienced over one foot of sea level rise on its shores, which will only accelerate over the coming decades—even if all combustion of fossil fuels were to end today. *Id.* ¶ 148 (pp. 114–16). Higher sea levels are submerging lowlands, exacerbating coastal flooding, inundating natural resources, and damaging the City's property and infrastructure. *Id.* The destructive force of hurricanes in Charleston is growing due to increased rainfall and windspeed, coupled with slower storm movement. *Id.* More frequent and severe flooding has rendered roads impassable and strained the City's drainage systems, necessitating an expensive rebuild. *Id.* Warming air temperatures have led to a host of impacts, including the spread of pathogens and invasive species and an increase in energy demand. *Id.* Important natural and cultural resources are being threatened and destroyed, and the City is experiencing a substantial increase in public health impacts. These burdens fall disproportionately on under-resourced communities and communities of color in Charleston, which will require additional resources from the City and others to respond and adapt to the climate crisis. *Id.* ¶ 149 (pp. 117–18).

The City has already spent, and will continue to expend, significant resources on mitigating these climate impacts. *Id.* ¶ 150 (pp. 118–19). This civil action does not seek to limit the extraction of fossil fuels, otherwise regulate greenhouse gas emissions, or set climate policy. Rather, the City seeks damages for the local harms it has already incurred—and for the costs of abating and mitigating the harms that it will suffer—as a result of Defendants' tortious campaign to mislead and to conceal the dangers of their fossil fuel products. *See id.* ¶¶ 12, 15, Prayer for Relief.

## III.    ARGUMENT

Defendants advance the same grounds for removal here that they have litigated and lost time and again, including before the Fourth Circuit. They say the Court has subject-matter jurisdiction over the City's entirely state-law claims by virtue of (1) federal common law that supposedly "governs" the City's claims; (2) the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*; (3) the federal officer removal statute, 28 U.S.C. § 1442; (4) necessary and disputed federal questions that render the City's claims removable under *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005); (5) complete preemption of the City's claims by the Clean Air Act, 42 U.S.C. § 7401 *et seq.* ("CAA"); (6) the federal enclave doctrine; and (7) CAFA. Every court that has considered these arguments has rejected them. Their only new jurisdictional theory—diversity jurisdiction premised on fraudulent joinder—is equally meritless.

As in all the previous cases, "[t]he principal problem with Defendants' arguments is that they misconstrue [the City's] claims." *City & Cnty. of Honolulu v. Sunoco LP*, No. 20-CV-00163-DKW-RT, 2021 WL 531237 (D. Haw. Feb. 12, 2021), *aff'd*, 39 F.4th 1101 (9th Cir. 2022). This lawsuit does *not* seek to "halt Defendants' production of oil and gas," "enjoin[] [their] production activities," "regulate the production and sale of oil and gas," "usurp . . . the direction of federal policy," "overturn decades of federal energy policy," "levy an unprecedented worldwide tax on lawful productive conduct," or otherwise prevent Defendants from operating their businesses. Notice of Removal ("NOR"), Doc. 1 at 2–6, 24 (Oct. 9, 2020). Instead, as the Fourth Circuit recognized in *Baltimore*, the "source of tort liability" in this litigation is Defendants' "concealment and misrepresentation of [fossil fuel] products' known dangers," together with their "simultaneous promotion of [those products'] unrestrained use." *Baltimore*, 31 F.4th at 233. As for remedies, the

5

City merely seeks to ensure that the parties who have profited from the tortious conduct also bear the associated costs in Charleston of adapting to and mitigating its impacts.

Once the Court discards Defendants' straw-man theory of the case, their purported grounds for removal crumble. The Complaint does not allege any federal common law claims, and Defendants have neither shown that any existing body of federal common law confers jurisdiction nor that there is a need or basis to craft new federal common law. The City's state-law claims are not removable under *Grable*, because they do not necessarily raise a substantial question of federal law. They are not completely preempted by the CAA, which does not in any way concern the deceptive marketing and advertising at the heart of this litigation and does not have complete preemptive force in any event. OCSLA does not provide a basis for jurisdiction because the City's claims do not "aris[e] out of, or in connection with," any operation conducted on the outer continental shelf ("OCS"). *See* 43 U.S.C. § 1349(b)(1). Nor does the federal officer removal statute, because no federal officer directed or controlled Defendants' efforts to conceal and misrepresent the dangers of fossil fuel consumption. Defendants cannot rely on federal enclave jurisdiction, both because the City disclaims injuries on federal land and because Defendants' disinformation campaign did not take place on any such land. The Fourth Circuit reached all of these holdings on nearly identical facts in *Baltimore*.

Defendants also cannot manufacture CAFA jurisdiction simply by calling this lawsuit a class action; the City pleaded claims under state laws that bear no resemblance to Federal Rule of Civil Procedure 23, as the District of Minnesota held in the analogous case before it. *See Minnesota*, 2021 WL 1215656 at *11–12. Finally, Defendants fail to carry their heavy burden in a fraudulent joinder challenge, as the City has substantially more than "a glimmer of hope" of prevailing in its

claims against the two in-state Defendants, which is all that is required to defeat a claim of fraudulent joinder. *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 426 (4th Cir. 1999).

### A.    General Legal Standards

"Because removal jurisdiction raises significant federalism concerns, [courts] must strictly construe removal jurisdiction." *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 197 (4th Cir. 2022); *Lontz v. Tharp*, 413 F.3d 435, 440 (4th Cir. 2005) (same). Accordingly, "the party seeking removal bears the burden of showing removal is proper," and "if federal jurisdiction is doubtful, a remand to state court is necessary." *Id.*; *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004) (*en banc*) (same).

The well-pleaded complaint rule governs whether a case "arises under" federal law for purposes of a district court's original and removal jurisdiction under 28 U.S.C. §§ 1331 and 1441. *E.g. Baltimore*, 31 F.4th at 197–98; *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 830 (2002). The rule "is the basic principle marking the boundaries of the federal question jurisdiction of the federal district courts," *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987), and "makes the plaintiff the master of the claim" such that "he or she may avoid federal jurisdiction by exclusive reliance on state law," *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). "Jurisdiction may not be sustained on a theory that the plaintiff has not advanced," *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 810 n.6 (1986), or on "an actual or anticipated defense," *Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009), "including the defense of pre-emption, even if both parties admit that the defense is the only question truly at issue in the case," *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 14 (1983).

**B.     The Fourth Circuit in *Baltimore* "Resoundingly" Rejected Defendants'
Position That Claims Like the City's Arise Under Federal Common Law.**

Defendants' arguments based in federal common law here are identical to those presented
in *Baltimore* and are foreclosed by it. The defendants there argued that "even though the Complaint
never says anything about federal common law, Baltimore's claims are 'inherently federal and
necessarily arise under federal law because they seek to impose liability based on the production
and sale of oil and gas abroad,'" meaning the city's claims sought to curb "interstate and/or
international pollution." 31 F.4th at 199. Defendants' arguments here are the same. They say
Charleston's causes of action "necessarily arise under *federal*, not state, law" and that "[t]he issues
presented are exclusively federal in nature," NOR at 29, ¶ 14, because "[c]laims for interstate or
international pollution implicate 'uniquely federal interests' and must out of necessity be subject to
uniform federal law as a matter of fundamental constitutional structure," NOR at 31, ¶ 18. The
Fourth Circuit considered that "perplexing argument," 31 F.4th at 204, and held that "[a]t most" it
presents "an ordinary preemption argument that does not warrant removal," *id.* at 208. *Baltimore*
controls, and this Court must "decline to permit Defendants to rely upon federal common law as a
theory of removal." *Id.* The Fourth Circuit's dissection of Defendants' federal common law
argument speaks for itself. *See id.* at 199–208. The following discussion nonetheless connects each
of Defendants' assertions here to the portions of *Baltimore* rejecting them.

First, the federal common law of interstate pollution nuisance that Defendants point to has
been overridden by Congress; it provides neither a cause of action nor basis for jurisdiction.
Defendants contend that "when, as here, 'we deal with air and water in their ambient or interstate
aspects, there is a federal common law,'" NOR at 31, ¶ 19 (quoting *Am. Elec. Power Co. v.
Connecticut*, 564 U.S. 410, 421 (2011) ("*AEP*")), and thus "state law simply has no role to play,"
NOR at 29 ¶ 14. That is incorrect, and misrepresents decades of Supreme Court precedent and

Congressional action. In reality, "federal common law in this area ceases to exist due to statutory displacement" by the Clean Air Act, and the City "has not invoked the federal statute displacing federal common law" which could separately supply jurisdiction. *Baltimore*, 31 F.4th at 204.

The Supreme Court in 1972 "recognized public nuisance as a federal common law claim" in the context of "disputes involving [pollution in] interstate and navigable waters." *Id.* (citing *Illinois v. City of Milwaukee*, 406 U.S. 91, 103–04 (1972)). Congress amended the Clean Water Act in 1981, however, "and the Court then held that the [Clean Water Act amendments] displaced the federal common law claim of public nuisance it had previously recognized for water pollution." *Id.* (citing *City of Milwaukee v. Illinois*, 451 U.S. 304, 312–20 (1981) ("*Milwaukee II*")). Three decades later in *AEP*, the Supreme Court considered whether plaintiffs "could invoke the federal common law of nuisance to abate out-of-state pollution and impose liability on five electric companies for global warming." *Id.* at 205 (cleaned up) (citing *AEP*, 564 U.S. at 418, 422). The Court "expressed uncertainty about the existence of federal common law for the plaintiffs," but ultimately held "that any 'federal common-law claim for curtailment of greenhouse gas emissions because of their contribution to global warming' was 'displaced by the federal legislation authorizing [the Environmental Protection Agency] to regulate carbon-dioxide emissions.'" *Id.* (quoting *AEP*, 564 U.S. at 423, 424).[4] "When a federal statute *displaces* federal common law, the federal common law ceases to exist," *id.* at 205 (collecting cases), and thus "[p]ublic nuisance claims involving interstate pollution, including issues about greenhouse-gas emissions, are nonexistent under federal common

---

[4] *See also Boulder*, 25 F.4th at 1259 ("What *Milwaukee II* did to the federal common law of interstate water pollution, *AEP* did to the federal common law of interstate air pollution."); *cf. Oakland*, 969 F.3d at 906 ("[T]he Supreme Court has not yet determined that there is a federal common law of public nuisance relating to interstate pollution."); *Minnesota*, 2021 WL 1215656 at *4 ("The Supreme Court has held . . . that that this area of federal common law has largely (though not entirely) been displaced by environmental statutes, including the Clean Air Act and Clean Water Act.").

law because they are statutorily displaced" by the Clean Air Act, *id.* at 206. "Since those claims are defunct, and invoking them is devoid of merit, a federal court cannot exercise federal-question jurisdiction on that basis"; here, as in *Baltimore*, "Defendants cite no authority justifying removal for nonexistent claims that have been displaced by federal statutes." *Id.* (quotation omitted). The Fourth Circuit in *Baltimore* specifically held it "defies logic" to suggest "removal is proper based on federal common law even when the federal common law claim has been deemed displaced, extinguished, and rendered null by the Supreme Court," and that is exactly what occurred with respect to the federal common law of interstate pollution nuisance. *Id.* at 206; *Rhode Island*, 35 F.4th at 53–54 ("[T]he Energy Companies cannot premise removal on a federal common law that no longer exists."). Defendants' theory must fail for this reason alone.

Second, Defendants argue that "the question of how to address greenhouse gas emissions (which underlies Plaintiff's claims and its requested relief) involves inherently federal concerns and can be resolved only by application of federal law," even absent Congressional say-so. NOR at 38, ¶ 30. But "how to address greenhouse gas emissions" is not the basis of the City's complaint, which rests instead on Defendants' tortious misrepresentations and failure to warn, "abetted by a sophisticated disinformation campaign." *Baltimore*, 31 F.4th at 233. "Jurisdiction may not be sustained on a theory that the plaintiff has not advanced." *Merrell Dow*, 478 U.S. at 810 n.6.

In any event, *Baltimore* squarely held not only that the Clean Air Act displaced any former federal common law, but also that there is no basis to create *new* federal common law that might fit Defendants' theory. "Judicial lawmaking in the form of federal common law plays a necessarily modest role under a Constitution that vests the federal government's 'legislative Powers' in Congress and reserves most other regulatory authority to the States." *Rodriguez v. Fed. Deposit Ins. Corp.*, 140 S. Ct. 713, 717 (2020). As such, "before federal judges may claim a new area for

common lawmaking, strict conditions must be satisfied." *Id.* Two indispensable such conditions are that "(1) there must be 'uniquely federal interests' at play, and (2) a party must show a 'significant conflict' between an identifiable federal policy or interest and the operation of state law or the application of state law would 'frustrate specific objectives' of federal legislation." *Baltimore*, 31 F.4th at 200–01 (cleaned up).

The defendants in *Baltimore* purported to "identify three 'uniquely federal interests' at play: (1) the control of interstate pollution; (2) energy independence; and (3) multilateral treaties." *Id.* at 202. The Fourth Circuit held that those generalized areas of concern were insufficient:

> Assuming these qualify as "uniquely federal interests," Defendants' request for federal common law still fails because they do not satisfy the necessary "precondition" of creating federal common law—the recognition of a significant conflict between a federal interest and state law's application. [citation] Defendants, who bear the removal burden, never establish a significant conflict between Baltimore's state-law claims—which purport to impose liability on Defendants for their marketing and use of their fossil-fuel products—and any federal interests within either their Notice of Removal or Opening Brief. [citations] . . . As the Supreme Court put it, failing to identify a significant conflict when requesting a court to create federal common law is "fatal" to a party's position. [citation] Given these failures, we see no reason to fashion any federal common law for Defendants.

*Baltimore*, 31 F.4th at 202. The court held that the defendants' failure to "point to any significant conflict" constituted "a complete abdication of their removal burden." *Id.* at 204.

The facts here are the same. Defendants allege that Charleston's claims generally implicate federal emissions regulation, nonspecific national energy concerns, and foreign policy.[5] But as in

---

[5] *See, e.g.*, NOR at 5 ("Plaintiff's claims . . . implicate the federal government's foreign affairs power and the Constitution's Foreign Commerce Clause."); 37, ¶ 28 (the City's claims implicate "treaty obligations and federal and international regulatory schemes"); 37–38, ¶ 29 ("fossil fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports") (quotation omitted); 38, ¶ 27 (climate change has "catalyzed myriad federal and international efforts to understand and address [greenhouse gas] emissions," and "these are complex policy-balancing problems, on a necessarily national scale, and without fixed 'right answers'").

*Baltimore*, Defendants' removal notice does not discuss any conflict between Maryland tort law and any specific federal statute, regulation, or identifiable policy decision. Defendants instead offer the unintelligible generalization that "the substance of the complaint's allegations and demands for relief reveal that those claims are exclusively federal by virtue of the structure of our Constitution." NOR 33, ¶ 21. Defendants' "fail[ure] to identify a significant conflict when requesting a court to create federal common law is 'fatal' to [their] position," and there is "no reason to fashion any federal common law for Defendants." *See Baltimore*, 31 F.4th at 202.

Third, again exactly like *Baltimore*, Defendants "present a perplexing argument that [Charleston's] claims must be resolved by federal common law because it is the source of the underlying claims," which is wrong for multiple reasons. *Id.* at 204. Defendants begin with the demonstrably false contention that *United States v. Standard Oil*, 332 U.S. 301 (1947), created a "two-step analysis . . . for determining whether a common law claim arises under state or federal law" as a "threshold jurisdictional question," whereby a court first asks "whether the source of law is federal or state based on the nature of the issues at stake," and then "determine[s] the substance of the federal law, including whether plaintiff has stated a viable federal claim." NOR at 33, ¶ 22. That is not true. *Standard Oil* was initiated in federal district court, and "did not turn on federal-question jurisdiction." *Baltimore*, 31 F.4th at 204 n.7. The decision does not discuss or analyze subject-matter jurisdiction at all, which existed because "the United States [wa]s the party plaintiff to the suit." *Standard Oil*, 332 U.S. at 316; *see* 28 U.S.C. § 1345 ("[T]he district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States."); *United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 667 (4th Cir. 1996) (noting the United States' authority "to bring suit at common law" in district court "can be traced to the First Judiciary Act of 1789"). The same is true of *United States v. Swiss American Bank, Ltd.*, 191 F.3d

30 (1st Cir. 1999), on which Defendants also rely. *See* NOR at 33–34, ¶¶ 22 & 23. The United States there sued an Antiguan bank "to recover assets accumulated by a convicted felon and later forfeited to the government as part of a plea bargain." *Id.* at 34. The United States "alleged in its complaint that [Fed. R. Civ. P.] 4(k)(2) supplied the necessary means for obtaining personal jurisdiction" over the Antiguan defendant, *id.* at 40, and "argue[d] vigorously that its case [wa]s founded on, and should be decided according to, federal common law," *id.* at 43, because only federal causes of action support the exercise of personal jurisdiction under that rule. *See* Fed. R. Civ. P. 4(k)(2). Neither *Standard Oil* nor *Swiss American Bank* say anything about removal jurisdiction, or about when a complaint alleging only state-law causes of action nonetheless "aris[es] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

In reality, the method for "determining whether a claim arises under state or federal law for jurisdictional purposes," NOR at 18, ¶ 20, is the well-pleaded complaint rule, aided by the analysis articulated in *Grable*. *See* Part IV.B, *infra*. For that exact reason, the court in *Baltimore* noted that even if the defendants could find a conflict between Maryland law and a uniquely federal interest, "the well-pleaded complaint rule would still forbid the removal of Baltimore's Complaint because it pleads no express invocation of federal common law." *Id.* at 204.[6]

There is no daylight between Defendants' federal common law arguments here and those that the Fourth Circuit "resoundingly" rejected in *Baltimore*. 31 F.4th at 199. There is no relevant extant body of federal common law, there is no basis to create one, and jurisdiction would still be

---

[6] *See also Hoboken*, 45 F.4th at 707 (holding that courts can only "recharacterize a state law claim as a federal claim removable to federal court . . . when some federal statute completely preempts state law," and rejecting the defendants' "suggest[ion of] a new form of complete preemption, one that relies not on statutes but federal common law" (cleaned up)).

absent even if either of those predicates were true because the City's Complaint pleads no federal

common law cause of action. Federal common law does not provide jurisdiction here.

### C.    *Baltimore* Forecloses Removal Under the Outer Continental Shelf Lands Act.

Defendants next assert removal is proper under OCSLA. *See* NOR 39–45, ¶¶ 32–42 The

*Baltimore* decision again controls, and again holds that Defendants' arguments are meritless.

OCSLA's jurisdictional provision grants district courts original jurisdiction

> of cases and controversies *arising out of, or in connection with* any operation
> conducted on the outer Continental Shelf which involves exploration,
> development, or production of the minerals, of the subsoil and seabed of the
> outer Continental Shelf, or which involves rights to such minerals . . .

43 U.S.C. § 1349(b)(1) (emphasis added). Interpreting the statute on first impression in *Baltimore*,

the Fourth Circuit "join[ed] [its] sister circuits and f[ou]nd that invoking jurisdiction under

§ 1349(b)(1) requires a but-for connection between a claimant's cause of action and operations on

the OCS." 31 F.4th at 220. "Under their plain meanings," the court held, the phrases "'arising out

of' and 'in connection with' both require a causal relationship to determine if a given controversy

actually 'result[s] (from)' or possesses a 'relationship in fact [with]' activities conducted on the

OCS." *Id.*[7] The statute thus asks whether a plaintiff's "injuries 'would not have occurred' but for

Defendants' conduct on the OCS." *Baltimore*, 31 F.4th at 220. "[A] 'mere connection' between a

claimant's case and operations on the OCS is insufficient to show federal jurisdiction if the

relationship is 'too remote.'" *Id.* at 221 (quoting *Deepwater Horizon*, 745 F.3d at 163).

---

[7] *Accord Boulder*, 25 F.4th at 1272; *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014);
*cf. San Mateo*, 32 F.4th at 754 (holding OCSLA jurisdiction "does not necessarily require but-for
causation" but that "the connection between [defendants'] conduct [on the OCS] and the injuries
alleged by the plaintiffs here is too attenuated to give rise to jurisdiction"); *Rhode Island*, 35 F.4th
at 59–60 ("[W]e need not wrestle the but-for-causation issue to the ground today. And that is
because despite the different approaches to construing § 1349(b), our sister circuits' application of
§ 1349(b) leads to a materially similar result.").

Applying the but-for connection test, the court in *Baltimore* noted that the city's "allegations and injuries are not confined to Defendants' fossil-fuel activities on the OCS," and the defendants' allegedly tortious "marketing practices, which led to increased consumption of their fossil-fuel products and then climate change, are far removed from their OCS activities and their tort liability." *Id.* at 221. "In other words, irrespective of Defendants' activities on the OCS, Baltimore's injuries still exist as a result of that distinct marketing conduct." *Id*. The facts and allegations here are the same. Defendants argue there is OCSLA jurisdiction because Charleston's Complaint supposedly "challenges *all of* Defendants' 'extraction' of 'oil, coal, and natural gas,'" and "a substantial quantum of those activities arises from OCS operations," therefore Charleston's claims arise in connection with OCS operations. NOR at 43, ¶ 38. But that is exactly the line of reasoning rejected in *Baltimore*: "Because Baltimore's injuries [arising from Defendants' misleading and deceptive marketing] remain even after we disregard whatever slice of Defendants' fossil-fuel production occurred on the OCS, we cannot find a but-for connection satisfying the OCSLA's jurisdictional grant." 31 F.4th at 221 (quotation omitted). There is no but-for connection.

Defendants argue there is also OCSLA jurisdiction because "the *relief* sought also arises in connection with and affects OCS extraction and development," since it might disincentivize OCS oil production. NOR at 44, ¶ 40. *Baltimore* rejected this argument, too. "Ignoring the OCSLA's text and judicial decisions applying it," the court said, "Defendants argue that the OCSLA's policy aims will be frustrated and a parade of horrible outcomes will ensue if we decline federal jurisdiction." 31 F.4th at 222. "Even if such speculative and policy-laden arguments were permitted," however, the cases the defendants relied on were "markedly different from Baltimore's suit because they involve[d] the intersection of commercial disputes satisfying the 'operation' element of the

OCSLA, not injurious torts impacting a municipality's citizenry and internal infrastructure." *Id.* (collecting cases).[8] Defendants' arguments here are the same, and likewise fail.

### D. Defendants' Federal Officer Removal Arguments Are Foreclosed by *Baltimore*, and the "New" Factual Details in Their Removal Notice Do Not Confer Jurisdiction.

The bulk of Defendants' removal notice and their supporting documents take a kitchen-sink approach to federal officer removal. *See* NOR at 45–88, ¶¶ 43–135. They assert that this case implicates virtually every interaction any Defendant has had with the government since at least the start of the twentieth century, covering everything from fossil fuel sales during World War II, to mineral leases on the OCS, operation of an oil reserve co-owned with the Navy, and fuel sales to the military. Several of those arguments are directly foreclosed by *Baltimore*, and Defendants' maintenance of them is frivolous. The remainder are facially meritless and have been rejected by every court that has considered them. Defendants have not shown they acted under federal officers within the meaning of 28 U.S.C. § 1442, and the few instances they cite that could constitute acting under a federal officer have nothing to do with the City's claims.

To remove a case under the federal officer removal statute, "a private defendant must show: (1) that it acted under a federal officer, (2) that it has a colorable federal defense, and (3) that the charged conduct was carried out for [or] in relation to the asserted official authority." *Baltimore*, 31 F.4th at 228 (cleaned up). Defendants have failed to make any of these showings.

---

[8] *Accord Boulder*, 25 F.4th at 1275 ("[I]t is difficult to see how such a prospective theory of negative economic incentives—flowing from a lawsuit that does not directly attack OCS exploration, resource development, or leases—is anything other than contingent and speculative."); *Rhode Island*, 35 F.4th at 60 (same); *Hoboken*, 45 F.4th at 712 (similar claims under Delaware and New Jersey law were "all too far away from Shelf oil production" to confer jurisdiction under OCSLA).

1.    **Charleston Has Not Brought Suit Against Defendants "For or Relating To" Any Act Defendants Committed Under Federal Direction.**

Defendants are not entitled to federal officer removal because the activities they assert they conducted under color of federal office "are insufficiently related to [Charleston's] claims for purposes of the [statute's] nexus prong." *Baltimore*, 31 F.4th at 230. Section 1442's third element, the "nexus prong," requires a removing defendant to demonstrate "a connection or association" between "the alleged government-directed conduct" and "the conduct charged in the Complaint." *Id.* at 233–34 (quoting *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017)). Defendants make no attempt to connect their alleged wrongful conduct to any government control.

The Fourth Circuit considered two of Defendants' relationships with the government in *Baltimore*—certain Defendants' OCS leases, *see* NOR 55–65, ¶¶ 63–83, and Chevron's operations at the Elk Hills Petroleum Reserve, *see* NOR 65–71, ¶¶ 84–101—and flatly deemed them insufficiently related to claims like Charleston's. The court explained:

> When read as a whole, the Complaint clearly seeks to challenge the promotion and sale of fossil fuel products without warning and abetted by a sophisticated disinformation campaign. Of course, there are many references to fossil fuel production in the Complaint, which spans 132 pages. But, by and large, these references only serve to tell a broader story about how the unrestrained production and use of Defendants' fossil fuel products contribute to greenhouse gas pollution. Although this story is necessary to establish the avenue of Baltimore's climate change-related injuries, it is not the source of tort liability. Put differently, Baltimore does not merely allege that Defendants contributed to climate change and its attendant harms by producing and selling fossil fuel products; it is the concealment and misrepresentation of the products' known dangers—and simultaneous promotion of their unrestrained use—that allegedly drove consumption, and thus greenhouse gas pollution, and thus climate change.

31 F.4th at 233–34. The same is true here. The crux of the City's Complaint is that Defendants failed to warn consumers and the public about known dangers associated with fossil fuel products and actively worked to deceive the public regarding those dangers. *See, e.g.*, Compl. at 1–5, ¶¶ 1–

17

13. Defendants' Notice of Removal does not attempt to connect those allegations to anything they claim they did at federal behest, because there is no such connection.

Notwithstanding the text of the Complaint, Defendants assert that this Court must "credit the defendant's theory of the case," NOR at 48–49, ¶ 47; 85–86, ¶ 131, under which liability necessarily depends on oil and gas production Defendants may have done under federal direction. Multiple district courts in analogous cases have rejected that position, because § 1442 does not "authorize Defendants to freely rewrite the complaint and manufacture a cause of action explicitly disclaimed by Plaintiff and then ask the Court to accept their 'theory of the case' for purposes of removal." *Delaware v. BP Am. Inc.*, 578 F. Supp. 3d 618, 636 n.21 (D. Del.), *aff'd sub nom. City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022).[9] As in *Baltimore*, Charleston's claims premise liability on Defendants' "concealment and misrepresentation of [fossil fuel] products' known dangers," so "the relationship between [the City's] claims and any federal authority over a portion of certain Defendants' production and sale of fossil fuel products is too tenuous to support removal under § 1442." 31 F.4th at 233–34.

Defendants' cited cases only underscore the differences between this lawsuit and those that satisfy the nexus standard. *See* NOR 47–48, ¶ 46. *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Philadelphia* involved efforts to bar attorneys at the Federal Community Defender Organization from representing clients in state post-conviction

---

[9] *See also Minnesota*, 2021 WL 1215656, at *5 ("To adopt Defendants' theory, the Court would have to weave a new claim for interstate pollution out of the threads of the Complaint's statement of injuries. This is a bridge too far."); *City & Cnty. of Honolulu v. Sunoco LP*, No. 20-CV-00163-DKW-RT, 2021 WL 531237, at *7 (D. Haw. Feb. 12, 2021) (granting motion to remand), *aff'd*, No. 21-15313, 2022 WL 2525427 (9th Cir. July 7, 2022) ("[I]f Defendants had it their way, they could assert *any* theory of the case, however untethered to the claims of [the complaint]," and "completely ignore the requirement that there must be a causal connection *with the plaintiff's claims*."); *accord Connecticut*, 2021 WL 2389739, at *11.

18

proceedings based on their alleged misuse of federal grant funds. 790 F.3d 457, 461 (3d Cir. 2015). The Third Circuit held "the acts complained of undoubtedly 'relate to' acts taken under color of federal office," because the case was predicated on the issue of whether "the Federal Community Defender is violating the federal authority granted to it." *Id.* at 472. The case thus involved a direct connection between acts taken under federal direction and the alleged tort. The same is true for *Baker v. Atlantic Richfield Co.*, where the plaintiffs alleged the defendants' manufacturing operations "tortiously contaminated" a housing complex, but the defendants claimed the government controlled and directed their operations at a facility they previously operated "*on the same site*" as the plaintiffs' homes. 962 F.3d 937, 940–41 (7th Cir. 2020) (emphasis added). In each of those cases, government-directed conduct overlapped in part or in whole with the culpable behavior alleged in the complaint. Defendants do not contend here that the government had any involvement in the alleged deceptive marketing and disinformation that underpin the City's claims.

Tellingly, Defendants dedicate forty pages of their removal notice to discussing in grueling detail all manner of federal programs they have participated in. *See* NOR at 49–88, ¶¶ 49–134. But the *two* pages they use to explain why any of that relates to Charleston's Complaint, *see* NOR at 47–49, ¶¶ 46–48, fail to do so. Any connection between this case and federal activity is highly attenuated and cannot satisfy federal officer removal.

## 2.    Defendants Have Not "Acted Under" Federal Officers in Any Relevant Way.

Even if any of Defendants' federal officer allegations had anything to do with this case, removal would still have been improper because Defendants have failed to show that they "acted under" a federal officer within the meaning of the statute. "In cases involving a private entity, the 'acting under' relationship requires that there at least be some exertion of 'subjection, guidance, or control' on the part of the federal government." *Baltimore*, 31 F.4th at 229 (quoting *Watson v.*

19

*Philip Morris Co.*, 551 U.S. 142, 151 (2007)). "Additionally, 'precedent and statutory purpose' make clear that 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* (quoting *Watson*, 551 U.S. at 152). "'[S]imply *complying* with the law' does not constitute the type of 'help or assistance necessary to bring a private [entity] within the scope of the statute,' no matter how detailed the government regulation or how intensely the entity's activities are supervised and monitored." *Id.* (quoting *Watson*, 551 U.S. at 153). By the same token, "a person is not 'acting under' a federal officer when the person enters into an arm's-length business arrangement with the federal government or supplies it with widely available commercial products or services." *San Mateo*, 32 F.4th at 757. While the federal officer removal statute is forgiving to removing defendants, courts "may not interpret § 1442(a) so as to 'expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries.'" *Id.* (quoting *Watson*, 551 U.S. at 153).

Each of the relationships with the government Defendants recite either describes compliance with generally applicable regulation or unremarkable commercial contracts. At most, some Defendants have had contractual relationships with the government over time, and "Congress endorsed oil operations and considered making a national oil company, but that does not show that oil production was a basic governmental task." *Honolulu*, 39 F.4th at 1108.

**_OCS Leases_**: Defendants argue that they acted and continue to act under federal subjection and control because they extract oil and gas from submerged OCS land leased form the government under OCSLA. *See* NOR at 55–65, ¶¶ 63–83. The Fourth Circuit in *Baltimore*, however, was "not convinced that the supervision and control to which OCSLA lessees are subject connote the sort of 'unusually close' relationship that courts have previously recognized as supporting federal officer removal." 31 F.4th at 232. "Though OCS resource development is highly regulated, 'differences in

the degree of regulatory detail or supervision cannot by themselves transform . . . regulatory *compliance* into the kind of assistance' that triggers the 'acting under' relationship." *Id.*[10]

Defendants' exhaustive discussion of OCSLA's statutory history, policy objectives, and proposed alternatives that never became law, *see* NOR at 50–65, ¶¶ 76–102, do not overcome *Baltimore*'s holding and do not alter what the statute or Defendants' leases actually say. Defendants note OCS leases require an environmental impact statement under the National Environmental Policy Act, NOR at 57–58, ¶¶ 67–68; and that lessees must submit "detailed plans" to federal agencies, *id.* at 58–59, ¶ 70; pay substantial royalties either in cash or in kind, *id.* at 61–63, ¶¶ 77–79; and comply with a range of regulations, *see id.* at 58–61, ¶¶ 70–76. Those are all "mere iterations of the OCSLA's regulatory requirements" that cannot confer jurisdiction. *See Baltimore*, 31 F.4th at 232. The smattering of never-enacted bills Defendants cite, which supposedly would have amended OCSLA to create a "national oil company," NOR at 56, ¶ 64, have no bearing on whether Defendants "acted under" federal officers when they extracted oil on the OCS for their own commercial purposes under the private leasing program that was actually enacted; an unenacted law establishes no federal control and evinces no congressional intent. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994).[11] None of this satisfies § 1442.

---

[10] *See also Hoboken*, 45 F.4th at 713 ("Though the federal government grants the leases, oil produced under them is produced 'to sell on the open market,' not specifically for the government. . . . Nor do the leases impose close federal control. And complying with run-of-the-mill regulations on oil and gas production is not enough for federal jurisdiction."); *Boulder*, 25 F.4th at 1253 (OCS leases "do not obligate Exxon to make a product specially for the government's use," and "do not require Exxon to tailor fuel production to detailed government specifications aimed at satisfying pressing federal needs"); *San Mateo*, 32 F.4th at 759–60 (OCS leases "do not require that lessees act on behalf of the federal government, under its close direction, or to fulfill basic governmental duties," and "the lease requirements largely track statutory requirements.").

[11] "These never-enacted bills provide no basis to find a congressional intent to create, directly or indirectly, a 'national oil company.' Thus, Defendants' contention that they are 'acting as agents' to achieve the same 'federal objective' . . . as would a speculative, non-existent 'national oil

***Other Federal Mineral Leases***: Defendants' arguments based on onshore mineral development on federal lands rely on the same flawed reasoning as their arguments about OCS mineral development. *See* NOR at 61–63, ¶¶ 75–79 The "willingness to lease federal property or mineral rights to a private entity for the entity's own commercial purposes, without more" does not show a private entity acts under a federal officer. *Baltimore*, 31 F.4th at 232. Defendants mischaracterize features of a Bureau of Land Management lease—including royalty payments, endangered species and natural resource protections, and termination provisions—none of which connotes unusually close federal supervision and control. *See* NOR at 62–63, ¶ 79. For example, 30 U.S.C. § 266(i) provides that leases will not be terminated for cessation or suspension of production; it does not, as Defendants claim, provide government authority to suspend operations. Similarly, 43 C.F.R. § 3103.4-4 provides that either party may suspend operations "in the interest of conservation of natural resources." These statutorily imposed terms apply to any lessee, under what Defendants correctly characterize as "[t]he standard BLM onshore lease." NOR 63 ¶ 79.

***Elk Hills Petroleum Reserve***: Next, Defendants seek to remove based on various activities by Standard Oil of California (Chevron's predecessor) at the Elk Hills Reserve in California. *See* NOR at 65–71, ¶¶ 84–101. That argument was rejected in *Baltimore*, because the court "simply ha[d] no idea whether production authorized by Congress [at Elk Hills] was carried out by Standard," and were "left wanting for pertinent details about Standard's role in operating the Elk Hills Reserve and producing oil therefrom on behalf of the Navy, which might bear directly upon the 'acting under' analysis." 31 F.4th at 237. Defendants' "new" evidence fails to remedy that deficiency and instead confirms that no Defendant's activities there support removal.

---

company' lacks merit." *Delaware v. BP Am. Inc.*, 578 F. Supp. 3d 618, 639 (D. Del.), *aff'd sub nom. City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022).

Boiled down, Defendants say Chevron operated the Elk Hills reserve under federal direction in two ways. First, Chevron's predecessor Standard Oil "entered into a Unit Plan Contract ('UPC')" with the Navy in 1944 that, according to Defendants, vested near total control in the Navy and used Standard Oil as a "third-party contractor to maximize production as quickly as possible." *See* NOR at 67, ¶ 87; 68, ¶ 94. But as the Ninth Circuit held in *San Mateo*, that is not an accurate description of the UPC. The agreement instead represents an "arm's-length business arrangement" that allowed Standard Oil and the Navy "to coordinate their use of the oil reserve in a way that would benefit both parties: the government maintained oil reserves for emergencies, and Standard ensured its ability to produce oil for sale." *San Mateo*, 32 F.4th at 759. Standard and the Navy both owned portions of the oil field, and "[a]s is common in the oil exploration and production industry, the two landowners entered into a unit agreement to coordinate operations" there. *Id.* at 758. "Standard's activities under the unit agreement did not give rise to a relationship where Standard was 'acting under' a federal officer for purposes of § 1442." *Id* at 759.

Second, Defendants argue that if the UPC is not sufficient, the 1971 Operating Agreement between Standard and the Navy surely is, because it says "OPERATOR [Standard Oil] is in the employ of the Navy Department and is responsible to the Secretary thereof." NOR at 69, ¶ 96; Declaration of Joshua Dick in Support of Notice of Removal Ex. 27, Doc. 1-29 at 5. Hard proof, they say, is that "[i]n November 1974, when a dispute arose concerning whether it was possible to produce 400,000 barrels per day to meet the unfolding energy crisis, the Navy directed the Unit Operator (Standard Oil) to prepare a plan, rejecting objections and advising Standard Oil" that it must comply with the Navy's demands. NOR at 69–70, ¶ 96. But rather than preparing that plan, "Standard Oil chose to withdraw from operating Elk Hills" less than two months later, in January 1975. *See* NOR at 70, ¶ 98 & n.134; Dick Decl. Ex. 28, Doc. 1-30 (letter dated Jan. 7, 1975 from

23

President of Standard Oil "advis[ing] Navy that Standard wishes to terminate its position as Operator of the Elk Hills Reserve"). Defendants straight-facedly characterize the termination as Standard's decision to "concentrate on other federal objectives," but that just means that when the Navy tried to compel Standard Oil to act, Standard declined, and turned its resources to expand "discovery and production of new oil reserves" *to sell for profit on the commercial market* with no government involvement whatsoever. *See* NOR at 70, ¶ 98; Dick Decl. Ex. 28, Doc. 1-30 at 2.

Defendants' own submissions make crystal clear that any obligation to expand production at Elk Hills in the 1970s was not Chevron's. Defendants concede that "other prime contractors operated Elk Hills for the Navy following 1975," so when the Naval Petroleum Reserves Production Act of 1976 "reopened the Elk Hills Reserve," Chevron participated at most "as subcontractors." NOR at 70–71, ¶¶ 99, 101. Defendants say Chevron was still deeply involved, citing a subcontract whereby Chevron would process natural gas offsite for the new Operator of the reserve. NOR at 71, ¶ 101 & n.138. But the one document they cite explains gas could not be processed at Elk Hills itself because Chevron "balked at sharing the cost for so much new plant construction, since it intended to process its share of gas at its plant" offsite, "the Government failed to convince Chevron that it should have its gas processed on the Reserve," and ultimately "the Government and Chevron reached a compromise" that allowed some new construction and some offsite processing. Dick Decl. Ex. 63, Doc. 1-65 at 16. There is no colorable argument that Navy exerted unusually close subjection, guidance, or control over Standard or Chevron at Elk Hills.

**_Strategic Petroleum Reserve_**: Defendants next argue their involvement with the Strategic Petroleum Reserve ("SPR") shows they have acted under federal officers. The SPR represents the United States' supply of emergency crude oil, and it has been stocked, from time to time, through in-kind royalty payments by certain Defendants under the terms of their OCS leases. NOR at 71–

74, ¶¶ 102–06. Defendants' arguments fail for the same reasons as their positions concerning the OCS and Elk Hills Reserve. "First, payment under a commercial contract—in kind or otherwise—does not involve close supervision or control and does not equal 'acting under' a federal officer. Second, operating the SPR involves a typical commercial relationship and Defendants are not subject to close direction." *Honolulu*, 39 F.4th at 1108.[12] Lease provisions requiring OCS lessees to participate "as a sales and distribution point in the event of an SPR drawdown," NOR at 78, ¶ 133, are also insufficient. The Secretary of Energy may "drawdown and sell petroleum products in the [SPR]" if the President makes certain findings. 42 U.S.C. § 6241(a), (d)(1). Apparently, some Defendants' leases contain provisions prescribing their role in the event of a drawdown. NOR at 77–78, ¶¶ 133–34. Those provisions too "are mere iterations of the OCSLA's regulatory requirements" that do not support removal. *Baltimore*, 31 F.4th at 232; *see also Honolulu*, 39 F.4th at 1108 ("Another Defendant . . . by contract must support the government if there is a drawdown on the reserve. But Defendants cannot show 'acting under' jurisdiction for SPR activities.").

*__Military Fuel Sales and Wartime Operations__*: Defendants' sales of fuel to the military at various times also fails for at least three reasons. <u>First</u>, Defendants' sales to the military have nothing to do with this case. Most of the conduct they cite "including Defendants' activities during the Korean War, the two World Wars, and events occurring still earlier than these—are irrelevant for purposes of removal because Defendants' alleged disinformation campaign, which is what the instant case is actually about, started 'decades later.'" *Delaware*, 578 F. Supp. 3d at 635.

<u>Second</u>, the Complaint "disclaims injuries . . . that arose from Defendants' provision of fossil fuel products to the federal government, and seeks no recovery or relief attributable to such

---

[12] *Accord Baltimore*, 31 F.4th at 232; *Boulder*, 25 F.4th at 1253 ("By winning bids for leases to extract fossil fuels from federal land in exchange for royalty payments, Exxon is not assisting the government with essential duties or tasks.").

injuries." Compl. at 14, ¶ 14. That disclaimer is effective, as courts in analogous cases have held. In *Delaware v. BP America Inc.*, for example, the State plaintiff disclaimed injuries from fuel sales to the military, and the court found that disclaimer severed any relation between those sales and the State's claims. The court held the disclaimer was "not a 'jurisdictional disclaimer' that categorically disclaims jurisdiction conferred by the federal officer removal statute, but is instead a 'claim disclaimer' that expressly disclaim[s] the claims upon which federal officer removal was based," and "federal courts have consistently granted motions to remand based on 'claim disclaimers.'" 578 F. Supp. at 635 (quotation omitted). The Third Circuit affirmed on the same basis in *Hoboken*:

> In their complaints, both Hoboken and Delaware insist that they are not suing over emissions caused by fuel provided to the federal government. . . . Resisting this conclusion, the companies say that these suits cannot separate harm caused by military fuel use from harm caused by civilian fuel use. So they ask us to disregard these disclaimers as 'merely artful pleading designed to circumvent federal officer jurisdiction.' [citation] But the disclaimers are no ruse. . . . Instead, Delaware and Hoboken carve out a small island that would needlessly complicate their cases.

45 F.4th at 713 (cleaned up); *see also Minnesota*, 2021 WL 1215656, at *11 (similar disclaimer effective as to federal enclave jurisdiction). The same analysis applies here.

Third, even taking their arguments on their own terms, "Defendants did not act under federal officers when they produced oil and gas during the Korean War and in the 1970s pursuant to the Defense Production Act," or in any of their fuel sales to the Department of Defense. *Honolulu*, 39 F.4th at 1107–08. Whether a government-contractor relationship satisfies the acting-under prong depends on both "the nature of the 'item' provided and the level of supervision and control that is contemplated by the contract." *Baltimore*, 31 F.4th at 230. A defendant must do more than show that the government "set forth detailed [product] specifications" for the item being purchased. *Id.* at 231 (quotations omitted). It must show that the government "close[ly] supervised" production by, for example, "exercis[ing] intense direction and control over all written documentation to be

26

delivered with [that product]" or "maintain[ing] strict control over the [product's] development." *Id.* (quoting *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 253 (4th Cir. 2017), and *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 399 (5th Cir. 1998)) (cleaned up).

Here, Defendants describe a grab-bag of different fuel formulations they provided to the government across several decades. NOR at 74–85, ¶¶ 107–30. But these fuel specifications show only that the government wanted Defendants to sell them particular products, not that the government exercised control or close supervision over their design, development, or production. Defendants' own exhibits demonstrate that the government left it largely to fossil fuel companies to design and deliver products that met the government's specifications. *See, e.g.*, NOR at 81, ¶ 120 n.181 ("Shell, and other companies, took on the task of developing these fluids." (quoting Dick Decl. Ex. 39) (cleaned up)); *id.* ("[The government] arranged for Shell to develop a special low-volatility, low-vapor-pressure kerosene fuel for the craft." (quoting Dick Decl. Ex. 38)). Defendants identify government contracts under which the Shell Oil Company apparently constructed "'special fuel facilities' to handle and store PF-1." NOR at 81, ¶ 120. But except for a few generic "inspection" provisions, those contracts do not contemplate any government control over *how* to accomplish the contracted tasks, requiring only "suitable" means. Dick Decl. Ex. 44, Doc. 1-46 at 24–25 (Contract No. AF33(657)-13272 (SH-516) (June 30, 1964)). The same goes for the various fuel-supply contracts cited in the Notice of Removal. These agreements apparently required government contractors to deliver fuels that met certain product specifications, but none of their provisions suggest the government exercised control over production beyond the type of "quality assurance" that is "typical of any commercial contract." *Baltimore*, 31 F.4th at 231.

At bottom, none of the relationships Defendants cite satisfy the federal officer removal statute's "acting under" requirement, and none have anything to do with the City's claims.

E.    **The Clean Air Act Does Not Completely Preempt State Law, and Defendants Have Abandoned Complete Preemption as a Basis of Removal.**

Defendants' Notice of Removal argues that the City's claims "are completely preempted by the Clean Air Act," NOR 107 ¶ 169, and puzzlingly adds that this case "would inevitably intrude on the foreign affairs power of the federal government and is completely preempted" for that reason as well, NOR 107 ¶ 168. In their Answering Brief in Opposition to Plaintiff's Motion to Remand, however, Defendants did not mention complete preemption at all. *See* Doc. 111 (Apr. 7, 2021). As Charleston explained in its original Reply brief, Defendants' failure to argue their position constitutes waiver, and the Court can reject complete preemption as a basis for jurisdiction for that reason alone. *See* Plaintiff's Reply in Support of Motion to Remand to State Court, Doc. 116 at 1–2 (May 5, 2021). Even if the Court were to consider it, however, Defendants' complete preemption argument is also directly foreclosed by *Baltimore*.

In *Baltimore*, the defendants argued, as here, that the City of Baltimore's claims were completely preempted by the Clean Air Act. "Complete preemption is an 'independent corollary' to the well-pleaded complaint rule," that "treats a state-law cause of action as based on a federal statute" for removal jurisdiction purposes. *Baltimore*, 31 F.4th at 198. The doctrine applies rarely, however, because "complete preemption applies only when Congress has clearly manifested an intent to make causes action removable to federal court." *Id.* at 199 (cleaned up). Courts "thus permit complete-preemption findings when: '(1) the preempting statute displays a clear congressional intent to "entirely displace" state law; and (2) the preempting statute creates an exclusive federal cause of action in an area of "overwhelming national interest."'" *Id.* (quoting *Skidmore v. Norfolk S. Ry. Co.*, 1 F.4th 206, 212 (4th Cir. 2021)). The Fourth Circuit in *Baltimore* analyzed the Clean Air Act's history and text in detail, *see id.* at 215–17, and held that "[i]n sum, there is simply nothing within the 'text of the statute' suggesting that state-law claims are

28

completely displaced by the CAA," *id.* at 217. The court thus "join[ed] [its] sister circuits and reject[ed] this complete-preemption argument from Defendants, especially when Defendants do not identify any statutory sections that indicate the complete preemption of Baltimore's state-law claims." *Id.* The Clean Air Act does not have complete preemptive force in general and does not completely preempt Charleston's claims in particular.

Defendants' amorphous argument that generalized foreign policy interests completely preempt Charleston's complaint is also baseless. *Baltimore* reinforced the judicial consensus that only a federal *statute* can completely preempt state law, when "Congress has clearly manifested an intent" to do so, because "congressional intent to displace state law must be clear in the text of the statute." *Id.* at 199 (cleaned up); *see also Hoboken*, 45 F.4th at 707 (reiterating that a court may "recharacterize a state law claim as a federal claim removable to federal court . . . "only when some federal statute completely preempts state law" and rejecting "a new form of complete preemption, one that relies not on statutes but federal common law" (cleaned up)). That limitation afford necessary respect to the well-pleaded complaint rule, and avoids the potentially grave federalism and separation of powers problems that would arise if federal judges could squint at a wholly state-law complaint removed from state court, find that it "really" presents claims under federal common law not tied to any statute, and hang its own jurisdiction on that determination.

The Ninth Circuit held that a district court may not transmute a state-law cause of action into a judicially crafted federal common law claim in *City of Oakland v. BP PLC*, 969 F.3d 895 (9th Cir. 2020), *cert. denied sub nom. Chevron Corp. v. City of Oakland, California*, 210 L. Ed. 2d 916 (June 14, 2021). The district court there denied the plaintiff municipalities' motion to remand, holding that their climate-change related state-law nuisance claims were "necessarily governed by federal common law" because they "raised issues relating to 'interstate and international disputes

29

implicating the conflicting rights of States or . . . relations with foreign nations' and that these issues had to be resolved pursuant to a uniform federal standard." *Id.* at 902. The Ninth Circuit reversed, holding that unless the plaintiffs' claims satisfied *Grable* or were completely preempted by statute, the claims did not arise under federal law for purposes of subject-matter jurisdiction. *See id.* at 904–06. Finding that neither exception to the well-pleaded complaint rule was satisfied, the court remanded for the district court to consider whether any other basis for jurisdiction existed. *Id.* at 911. No authority supports Defendants' argument that "the foreign affairs power of the federal government" can completely preempt state law.

### F.    *Baltimore* Forecloses Defendants' Federal Enclave Jurisdiction Argument.

Defendants' Notice of Removal next contends that the Court "has original jurisdiction under the federal enclave doctrine." NOR 112 ¶ 179. That argument was also abandoned in Defendants' Opposition to the City's original Motion to Remand, and the Court should disregard it. *See* Reply, Doc. 116 at 1–2. Regardless, it too is foreclosed by *Baltimore*. Under the federal enclave doctrine, the federal government "possesses 'sole jurisdiction' over its enclaves," which include certain categories of federal land defined in the Constitution. *Baltimore*, 31 F.4th at 218; U.S. Const. art. I, § 8, cl. 17. "Accordingly, federal courts have federal question jurisdiction over tort claims that arise on federal enclaves." *Baltimore*, 31 F.4th at 218. In *Baltimore*, the plaintiff explicitly "exclude[d] federal enclaves from its Complaint 'unless otherwise stated,'" and "emphasize[d]" that its injuries "have taken place within Baltimore's borders and not on a federal enclave." *Id.* The court noted that "federal-question jurisdiction tied to federal enclaves generally requires that *all* pertinent events take place on a federal enclave," and thus "agree[d] with the district court and affirm[ed] its firm rejection of jurisdiction based on this doctrine." *Id.* at 219. All the same is true here. The City's Complaint "disclaims injuries arising on federal property," Compl. 5 ¶ 14, including "federal

property in Charleston," Compl. 119 ¶ 150, n.136. Because the City was not injured on any federal

land and does not allege any basis for liability otherwise arising on federal land, there can be no

enclave jurisdiction under *Baltimore*.

> **G.     The Class Action Fairness Act Cannot Provide Jurisdiction Because This Is Not a Class Action, and Defendants Have Abandoned the Argument.**

 Defendants have also abandoned the theory asserted in their Notice of Removal that the

Court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1453 ("CAFA"), by failing

to argue it in its first Opposition. *See* NOR 115–122 ¶ 184–96; Reply, Doc. 116 at 1–2. In any event,

the argument is frivolous. Certain "class actions" are removable under CAFA, with a "class action"

defined as "any civil action filed under Rule 23 of the Federal Rules of Civil Procedure or similar

State statute or rule of judicial procedure." 28 U.S.C. §§ 1332(d)(1)(B), 1453(a). A court determines

whether a case is a class action within the meaning of the statute by looking to the law under which

the action was filed and determining whether it "closely resembles Rule 23 or is like Rule 23 in

substance or in essentials." *W. Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*, 646 F.3d 169, 174

(4th Cir. 2011).

Defendants make no attempt to identify procedural similarities between Rule 23 and the

state laws authorizing the City to initiate and maintain the present lawsuit, and there are none. Those

laws have "none of the essential requirements for a Rule 23 class action." *CVS Pharmacy*, 646 F.3d

at 175–76. They do not, for example, "impose[] any of the familiar hallmarks of Rule 23 class

actions; namely, adequacy of representation, numerosity, commonality, typicality, or the

requirement of class certification." *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 216 (2d Cir.

2013); *see also CVS Pharmacy*, 646 F.3d at 172 (same). Defendants say "this suit was filed on

behalf of a class of 'consumers in Charleston and throughout South Carolina,'" NOR ¶ 189, but

none of the laws that give rise to this action grant the City the authority to sue on behalf of others,

much less the authority to "bind all class members to the judgment entered for or against the [City]," *CVS Pharmacy*, 646 F.3d at 175. In fact, the Unfair Trade Practices Act expressly prohibits private parties from asserting claims "in a representative capacity." S.C. Code § 39-5-140(a). Defendants identify no case that even remotely supports their position that CAFA permits removal any time a civil action protects or implicates the interests of consumers. If the Court considers this argument it must reject it, as have all other courts to consider it. *See Massachusetts*, 462 F. Supp. 3d at 47–51; *Minnesota*, 2021 WL 1215656, at *11–12.

## H.     The South Carolina Resident Defendants Were Not Fraudulently Joined.

Finally, as explained in the City's original Memorandum and Reply, the in-state Defendants' fraudulent joinder argument is meritless. "The party alleging fraudulent joinder bears a heavy burden—it must show that the plaintiff cannot establish a claim even after resolving all issues of law and fact in the plaintiff's favor." *Johnson v. Am. Towers, LLC*, 781 F.3d 693, 704 (4th Cir. 2015) (quoting *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir.1999)). "The removing party must show either outright fraud in the plaintiff's pleading of jurisdictional facts or that there is *no possibility* that the plaintiff would be able to establish a cause of action against the in-state defendant in state court." *Id.* (cleaned up). Defendants do not contend the Complaint's allegations are fraudulent, and cannot carry their burden to show Charleston has no possibility of recovery.

To succeed on their theory of fraudulent joinder, Defendants must "negate all possibility of recovery" against Brabham and Piedmont. *Hartley*, 187 F.3d at 425. "This standard," the Fourth Circuit has explained, "is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under [Rule] 12(b)(6)." *Johnson*, 781 F.3d at 704. A court must "resolv[e] all issues of law and fact in the plaintiff's favor." *Id.* And once a court finds even "a glimmer of hope for the plaintiff" or "a slight possibility of a right to relief" against an in-state defendant, "the

jurisdictional inquiry ends" and the fraudulent-joinder challenge fails. *Hartley*, 187 F.3d at 426. In conducting this analysis, moreover, courts must take care not to "delve[ ] too far into the merits" of the case. *Id.* at 425. Instead, where a district court "cannot predict with certainty how a state court and state jury would resolve the legal issues and weigh the factual evidence in [a] case," it must accept joinder of the in-state defendants, because doing so advances "the purpose of jurisdictional rules" to "minimize threshold litigation over jurisdiction." *Id.* at 425–26.

Defendants do not identify any judicial decision that "squarely" forecloses the City's claims against Brabham and Piedmont. *Id.* at 424. Rather, they advance an inherently fact-based argument, claiming that the two in-state defendants were not "a substantial factor" in causing the City's harm. NOR ¶ 205 (emphasis omitted). As the Fourth Circuit warned in *Hartley*, however, a fraudulent-joinder challenge is generally not "the appropriate stage of litigation" to draw conclusions about "proximate cause," as those "questions of fact" are "ordinarily left to the state court jury." *Hartley*, 187 F.3d at 425; *see also Stoney Marine Int'l Ltd. v. Arthur J. Gallagher & Co.*, No. 2:16-CV-1154-DCN, 2016 WL 7334862, at *3 (D.S.C. Dec. 19, 2016) (same). Indeed, the South Carolina Supreme Court has observed that "[o]nly in rare or exceptional cases may the issue of proximate cause be decided as a matter of law." *Gause v. Smithers*, 403 S.C. 140, 150 (S.C. 2013). Thus, unless a contested issue of causation can be resolved "with the snap of a finger," a court should refrain from concluding that a plaintiff "has no chance of establishing the facts necessary to support her tort claims." *Hartley*, 187 F.3d at 425. The City's claims against Piedmont and Brabham clear that low hurdle.

I.    **The Court Should Award the City Just Costs and Fees Because Defendants Had No Objectively Reasonable Basis to Remove This Case.**

Defendants' notice of removal is objectively unreasonable and justifies an award of the City's fees and expenses, including attorneys' fees. If the Court grants remand, it may "require

payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal" in the same order. 28 U.S.C. § 1447(c). An award of fees is proper where "the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). The provision's purpose is to "deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party." *Id.* at 141.

Defendants' wearying 128-page Notice of Removal, supported by 105 exhibits and two expert declarations between the Notice itself and Defendants' Opposition brief, is meritless in every respect. As Charleston has now explained in detail multiple times, none of Defendants' arguments have any support in existing law or any good-faith argument for changing existing law. The Fourth Circuit rejected every basis for jurisdiction before it in *Baltimore*, raised by many of the same defendants, in a materially similar case. Four other circuit courts have agreed in 2022 alone that climate-change related state-law claims like Charleston's are not within the original jurisdiction of the district courts and are not removable. No court anywhere has agreed with any of Defendants' arguments, or even found they were close calls. Defendants have nonetheless successfully filibustered Charleston's case for two years through wholly unnecessary jurisdictional litigation. This is exactly the circumstance in which fees are warranted. *See, e.g.*, *Robinson v. Pfizer Inc.*, No. 4:16-CV-439 (CEJ), 2016 WL 1721143, at *4 (E.D. Mo. Apr. 29, 2016) (awarding attorneys' fees where multiple courts had remanded cases removed on same basis).

## IV.    CONCLUSION

For the foregoing reasons, the City requests that this Court remand the Complaint to state court and grant the City its just costs of litigating Defendants' objectively unreasonable removal.

Respectfully submitted,

Dated: September 27, 2022

By: _/s/ Wilbur Johnson_____
    Wilbur Johnson
**OFFICE OF THE**
**CORPORATION COUNSEL**
**CITY OF CHARLESTON**
WILBUR JOHNSON
  Corporation Counsel
JULIA COPELAND
MELISSA CRUTHIRDS
  Assistants Corporation Counsel
50 Broad Street,
Charleston, South Carolina 29401
Email: wjohnson@ycrlaw.com
      copelandj@charleston-sc.gov
      cruthirdsm@charleston-sc.gov


By: _/s/ Joseph P. Griffith, Jr._____
JOSEPH P. GRIFFITH, JR.
JOE GRIFFITH LAW FIRM, LLC
946 Johnnie Dodds Blvd.
Mt. Pleasant, South Carolina 29464
Tel: (843) 225-5563
Fax: (843)723-6686
Email: joegriffithjr@hotmail.com


**SHER EDLING LLP**
VICTOR M. SHER (*pro hac vice*)
MATTHEW K. EDLING (*pro hac vice*)
TIMOTHY R. SLOANE (*pro hac vice*)
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
Tel: (628) 231-2500
Fax: (628) 231-2929
Email: vic@sheredling.com
      matt@sheredling.com
      tim@sheredling.com

*Attorneys for Plaintiff*
*the City of Charleston*